UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

REGINALD KEATON,
    Plaintiff,

v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
    Defendant.

No. 3:18-cv-483 (SRU)

**RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS**

In this Social Security appeal, Reginald Keaton moves to reverse the decision by the Social Security Administration ("SSA") denying his claim for disability insurance benefits. The Commissioner of Social Security moves to affirm the decision. Because the Administrative Law Judge's ("ALJ") determination was supported by substantial evidence, I grant the Commissioner's motion and deny Keaton's.

**I.    Standard of Review**

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If

the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*,

722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Reginald Keaton filed an application for Supplemental Security Income benefits on June 10, 2014. ALJ Decision, R. at 44.[1] In his application, Keaton alleged a disability onset date of June 1, 2013. At the time of the alleged disability onset, Keaton was 49 years old. Keaton identified his disability as arthritis in back, left hand injury, dislocated shoulder, neck problems, pain in left side due to stabbing, muscle spasms in left leg, asthma, allergies, headaches, and high cholesterol. Disability Report – Adult, from SSA, R. at 232. The SSA initially denied his claim on July 17, 2014, and again on reconsideration on September 22, 2014, finding that Keaton's "condition [was] not severe enough to be considered disabling." T16 Notice of Disapproved Claim, R. at 148.

---

[1] Keaton initially filed applications for Title II Disability Insurance Benefits and SII on September 12, 2011. Prior File-ALJ Hearing Decision, R. at 109. That decision was unfavorable to Keaton. *Id.* at 109-25. Keaton subsequently filed this application.

3

Keaton requested a hearing before an Administrative Law Judge ("ALJ") on September 25, 2014, and a hearing was held before ALJ Louis Bonsangue on April 27, 2016. ALJ Decision, R. at 44. At the hearing, the ALJ questioned Keaton about his conditions, work history, treatment history, and ability to perform daily working and living functions. Tr. of ALJ Hr'g, R. at 64–103.

Keaton responded that he walked with a cane, but that he did not have it with him the day of the hearing because he had forgotten it. *Id.* at 71. Further, he testified that his girlfriend handled laundry, cooking, shopping, and cleaning his apartment because it "bother[ed]" his back to "bend down too much[.]" *Id.* at 74. Keaton stated that he did not drive. *Id.* at 71. He told the ALJ that he had "muscle spasms in [his] back" and that, during the hearing, he could feel "lower case and higher case pain from [his] neck." *Id.* at 81. Keaton told the ALJ that to treat his back pain, he took "a lot of hot baths" as well as Percocet. *Id.* at 81–82. He stated that he had arthritis in his back, as well as "rotary cuff damage" to his right arm, which impeded his ability to lift boxes in his job while loading and unloading trucks. *Id.* at 82. He testified that he had "a lot of agony, and [] a lot of tingling" and that sometimes his arm would fall asleep. *Id.* at 84. He also stated that he could not lift anything using his arm because his left middle finger would not bend, and he had difficulty bending his left ring finger. *Id.* He also stated that his right fingers would become numb and cramp up, and pain would shoot into his arm and shoulder. *Id.* at 85. He first testified that his right leg cramped up, but pointed to his left leg. *Id.* He then corrected his statement and said that his right leg cramped. *Id.*

The ALJ then heard testimony from Vocational Expert Renee Jubreys, who testified that Keaton's prior work as truck driver helper was considered heavy work; his past work as a sandblaster was considered medium work; and his past work as a carpenter was considered medium work. *Id*. at 90–91.

The ALJ asked Jubreys to consider a hypothetical individual of the same age, education, and experience as Keaton, who was limited to performing medium exertion level work with the following limitations: could frequently climb ramps and stairs; never climb ropes, ladders, and scaffolds; frequently balance, but only occasionally stoop, crouch, kneel, or crawl. Tr. of ALJ Hearing, R. at 91.

The ALJ asked Jubreys whether that hypothetical individual could perform any of Keaton's prior jobs, and she testified that sandblaster was the only prior job that this hypothetical individual could perform. *Id*. at 91. The ALJ then asked Jubreys whether there were other occupations that such an individual could perform. Jubreys testified that the hypothetical individual could work: as a hospital cleaner, with approximately 150,000 jobs in the national economy; as a cook helper, with approximately 265,000 jobs in the national economy; and as a hand packager, with approximately 45,000 jobs in the national economy. *Id*. at 92.

The ALJ then changed the hypothetical, adding that the hypothetical individual: would be limited to no overhead reaching of the right upper extremity, which is also the dominant arm. *Id*. at 93. With this additional restriction, Jubreys testified that the hypothetical individual could still perform work as a hospital cleaner, a cook helper, or a hand packager, but could not perform work as a sandblaster. *Id.* The ALJ then changed the hypothetical again, adding that the hypothetical individual: would be limited to frequent handling and fingering of the left upper extremity as well. *Id.* at 94. Jubreys testified that the only remaining job previously listed that the hypothetical individual could perform would be the hospital cleaner. *Id.* An additional job that the hypothetical individual could perform would include: hospital food service worker, with approximately 70,000 jobs in the national economy. *Id.* at 95.

5

The ALJ then changed the hypothetical again, and asked Jubreys to consider a hypothetical individual of the same age, education, and experience as Keaton, who was limited to performing light exertion level work with the same limitations as in the previous hypothetical, but adding a sit/stand option at will. Tr. of ALJ Hearing, R. at 95. With this additional sit/stand option, Jubreys testified that the hypothetical individual could perform work as a cashier, with approximately 82,000 in the national economy; as an office helper, with approximately 40,000 in the national economy; and as a ticket taker, with approximately 25,000 jobs in the national economy. *Id.* at 96. The ALJ then put forward a slightly different hypothetical, in which he limited the hypothetical individual to only occasional handling and occasional fingering of the left upper extremity, which did not rule out any of the previous three jobs. *Id.* at 97. The ALJ then changed the hypothetical to limiting the individual to only occasional reaching bilaterally at the light level, which Jubreys testified would eliminate the previous three jobs. *Id.* at 97–98. Jubreys testified, however, that the following jobs could be performed: usher, with approximately 60,000 in the national economy; school bus monitor; with approximately 20,000 jobs in the national economy; and counter clerk, with approximately 25,000 jobs in the national economy. *Id.* at 99.

On August 3, 2016, the ALJ issued an opinion in which he found that Keaton was not "under a disability within the meaning of the Social Security Act since June 10, 2014." ALJ Decision, R. at 45. At the first step, the ALJ found that Keaton "ha[d] not engaged in substantial gainful activity since June 10, 2014, the application date." *Id*. at 46. At the second step, the ALJ determined that Keaton's impairments of "lumbar degenerative disc disease, status post right rotator cuff repair and left hand injury" were severe impairments that caused "significant limitations in [Keaton's] ability to perform basic work activities." *Id*.

6

At the third step, the ALJ determined that Keaton "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments." ALJ Decision, R. at 47. In making this finding, the ALJ considered whether Keaton's upper extremity impairments met or medically equaled listing section 1.02 (major dysfunction of the joint). *Id*. The ALJ found that it did not, because the record "consistently show[ed] that [Keaton] ha[d] full strength of the upper extremities." The ALJ also determined that Keaton's degenerative disc disease of the cervical and lumbar spine did not meet or medically equal the criteria of listings 1.04 because Keaton demonstrated only minimal changes to his cervical and lumbar spine and "no lumbar stenosis" *Id*. at 47–48.

The ALJ then assessed Keaton's residual functional capacity and found that he could "perform medium work" with certain limitations. *Id*. at 48. The limitations were that Keaton: could climb ramps and stairs frequently; could never climb ladders, ropes, and scaffolds, could frequently balance; could occasionally stoop, crouch, kneel, and crawl; could not reach with the dominant right upper extremity; and could perform frequent handling and fingering with the left upper extremity. *Id*. at 48.

The ALJ determined that Keaton's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." ALJ Decision, R. at 51. However, the ALJ decided that "[Keaton's] statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id*.

Because the ALJ found that Keaton was capable of making a successful adjustment to other work, he concluded that "a finding of 'not disabled' [was] therefore appropriate" and denied Keaton's request for disability benefits. *Id*. at 53.

7

Keaton requested a review of the ALJ's decision by the SSA's Appeals Council on August 3, 2016. Notice of Appeals Council Action, R. at 1. The SSA Appeals Council "found no reason . . . to review the Administrative Law Judge's decision," and denied Keaton's request for review. *Id*. Keaton then filed a complaint before this court urging reversal of the Commissioner's decision on March 21, 2018. Compl., Doc. No. 1. Keaton filed a Motion to Reverse on November 15, 2018. Mot. Rev., Doc. No. 21. The Commissioner filed a Motion to Affirm on February 5, 2019. Mot. Affirm, Doc. No. 24.

**III.    Discussion**

Keaton seeks reversal of the Commissioner's final decision finding that he was not disabled and not entitled to supplemental security income (SSI) under Title XVI of the Social Security Act. Keaton filed a motion labeled "Motion to Reverse the Decision of the Commissioner", Doc. No. 21, and later filed a document titled "Supporting Memorandum of Law", Doc. No. 23, but neither document asserts any particular arguments regarding errors made by the ALJ. The Commissioner responds that the ALJ's "decision is supported by substantial evidence and is based upon the application of correct legal standards," and should be affirmed. Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 2.

For the reasons that follow, I affirm the decision of the Commissioner.

A. <u>Was the ALJ's residual functional capacity determination supported by substantial evidence?</u>

The Commissioner argues that "the ALJ considered the totality of the evidence, including treatment notes from Plaintiff's primary care provider and treating nephrologist, hospital records, radiological studies, and Plaintiff's own statements regarding his daily activities and symptoms. The ALJ then reasonably found that Plaintiff retained the ability to perform medium work with

8

additional limitations to account for his history of right shoulder and left hand injuries." Mem. Supp. Mot. Affirm, Doc. No. 24-1, at 13–14.

Between steps three and four of the SSA's analysis for disability claims, the ALJ must "determine[], based on all the relevant medical and other evidence of record, the claimant's 'residual functional capacity,' which is what the claimant can still do despite the limitations imposed by his impairment." *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. § 404.1520(b)). The ALJ's determination need not "perfectly correspond with" any medical source opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Rather, the ALJ is "entitled to weigh all of the evidence available to make a[] . . . finding that [is] consistent with the record as a whole." *Id.* In assessing a claimant's residual functional capacity, SSA regulations require the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)," as well as "discuss the [claimant]'s ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the [claimant] can perform based on the evidence available in the case record." Social Security Ruling 96-8p, 1996 WL 374184, at *7. Finally, the ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In making a residual functional capacity determination in the present case, ALJ Bonsangue extensively considered Keaton's complaints as well as his voluminous medical records. ALJ Decision, R. at 48–50. The ALJ determined that Keaton's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Keaton's] statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record." ALJ Decision, R. at 51.

The ALJ determined that although Keaton sought treatment for pain and was prescribed pain medication, a magnetic resonance imaging (MRI) showed minimal degenerative changes of the lumbar and cervical spine. *Id.* at 49, citing Exhibit C13F, Progress Notes, from Burgdorf Ambulatory Care Center, R. at 444. Dr. Keith Eigen, Keaton's examining physician, determined that Keaton was probably not a surgical candidate. *Id.* The ALJ also noted that Keaton was not referred for physical therapy, but instead was treated solely with narcotic medications. *Id.* at 51.

Regarding Keaton's own testimony, ALJ Bonsangue noted that his credibility was diminished for multiple reasons: first, Keaton testified that he is unable to work due to back pain extending into his left lower extremity and upper extremity, but the medical evidence did not support that complaint. *Id.* In addition, although Keaton testified that he had been prescribed a cane, he did not bring the cane to the ALJ hearing, and his physical exams showed that he had a normal unassisted gait. *Id.* (citing Exhibit C6F, PCP Office Treatment Records, from Burgdorf Ambulatory Care Center).

Hence, the ALJ correctly "t[ook] the claimant's reports of pain and other limitations into account" and "exercise[d] discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). He did not, and "[was] not required to[,] accept the claimant's subjective complaints without question." *Id.*; *cf. Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (summary order) ("treating physician's opinions . . . based upon plaintiff's subjective complaints of pain and unremarkable objective tests" were "not 'well supported by medically acceptable clinical and laboratory diagnostic techniques'" and not entitled to "controlling

weight") (citing 20 C.F.R. §§ 404.1527(d)(2) , 416.927(d)(2)); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the court] must defer to his findings.").

In short, Keaton's case presented a significant quantity of conflicting medical and opinion evidence, with doctors who disagreed on the nature, severity, and cause of his symptoms. Because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," the ALJ was entitled to "choose between properly submitted medical opinions" and to consider "other substantial evidence in the record" in determining Keaton's residual functional capacity. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). The ALJ found that Keaton "has the residual functional capacity to perform medium work" and stated that he should not perform "frequent climbing of ramps and stairs, never climb ladders, ropes and scaffolds", should not perform "frequent balancing, occasional stooping, crouching, kneeling, and crawling;" and should avoid "overhead reaching with the dominant right upper extremity and frequent handling and fingering with the left upper extremity." ALJ Decision, R. at 48. In crafting those limitations, the ALJ relied on substantial evidence in the form of Keaton's testimony, treatment notes, and opinions by consultative and examining physicians. "[O]nce an ALJ finds facts, [I] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted). Under that "very deferential standard of review," I consider the ALJ's residual functional capacity finding to have been based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 448; *Greek*, 802 F.3d at 375. Therefore, because "there is substantial

evidence to support the determination," I find no error with respect to the ALJ's decision on that point. *See Selian*, 708 F.3d at 417.

## IV. Conclusion

For the reasons set forth above, I DENY Keaton's Motion for Judgment on the Pleadings (Doc. No. 21) and GRANT the Commissioner's Motion to Affirm (Doc. No. 24). The clerk shall enter judgment and close the file.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge